J-S53017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF M.D.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.M.E., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1178 EDA 2017 |

Appeal from the Decree and Order Dated March 17, 2017
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-A0201

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.N.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.M.E., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1182 EDA 2017 |

Appeal from the Decree and Order Dated March 17, 2017
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-A0202

BEFORE: BENDER, P.J.E., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OLSON, J.: **FILED OCTOBER 02, 2017**

D.M.E. ("Father") appeals from the decrees and orders dated and entered on March 17, 2017, granting the petitions filed by the Montgomery County Office of Children and Youth ("OCY" or "the Agency"), to involuntarily terminate his parental rights to his dependent, male children, M.D.J. (born in December of 2010) and T.N.J. (born in May of 2012) (collectively, "the

Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b), and change the permanency goal for the Children to adoption pursuant to 42 Pa.C.S.A. § 6351.[1]  We affirm.

On December 6, 2016, OCY filed petitions to terminate Father's parental rights to the Children and to change the Children's permanency goal to adoption.  On February 15, 2017, the trial court held a hearing on the termination/goal change petitions.  At the hearing, counsel for OCY, Attorney Christina T. Terebelo, Father and his counsel, Attorney Henry S. Hiles, III, and the guardian *ad litem* ("GAL"), Attorney Shannon Hayden, were present.  OCY presented the testimony of Courtney Jackson, a caseworker for the Community Umbrella Agency ("CUA") Open Door International, responsible for supervising visits between the Children and their parents.  N.T., 2/15/17, at 9.  OCY then presented the testimony of Rebecca Wheeler, an OCY employee who previously worked for Carson Valley Children's Aid as a Time Limited Family Reunification ("TLFR") worker. *Id.* at 20.  OCY next presented the testimony of its caseworker assigned to

---

[1] On October 24, 2016, the mother of the Children, S.J. ("Mother"), signed consents to the termination of her parental rights to the Children.  On December 6, 2016, OCY filed petitions to confirm the consents.  After a hearing held on January 26, 2017, the trial court granted the petitions to confirm the consents, and voluntarily terminated the parental rights of Mother to the Children.  Mother has not filed an appeal from the termination of her parental rights or the goal change, nor is she a party in the present appeal.

the Children, Joan Dolan. *Id.* at 30. Next, OCY presented the testimony of Cathy Milliman, a caseworker in the Adoption Unit assigned to the Children. *Id.* at 68. Father testified on his own behalf. *Id.* at 86. The GAL actively cross-examined all of the witnesses.

At a separate hearing on March 17, 2017, based on the testimony and the documentary evidence at the hearing on February 15, 2017, the trial court ordered Father's parental rights to the Children terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b), and the permanency review goal for the Children to adoption. N.T., 3/17/17, at 17, 20-23. The trial court entered its decrees and orders on its docket on that same date.[2]

On April 13, 2017, Father filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1921(b). This Court, acting *sua sponte*, consolidated the appeals on May 4, 2017.

In his brief on appeal, Father raises the following issues:

1. Did the Honorable trial court commit error in terminating the parental rights of Father, pursuant to 23 Pa.C.S.A. [§] 2511(a)(1), when the testimony at trial demonstrated that Father had made significant efforts to maintain (i) suitable housing, (ii) gainful employment and (iii) a positive and important relationship with the Children, and at no point evidenced a settled purpose of relinquishing his parental claim or failing or refusing to [perform] parental duties?

---

[2] In an order entered on April 17, 2017, the trial court adopted its on-record discussion from the hearing held on March 17, 2017 as its opinion for purposes of Pa.R.A.P. 1925(b), *citing* N.T., 3/17/17, at 4-23.

2. Did the Honorable trial court commit error in terminating the parental rights of Father, pursuant to 23 Pa.C.S.A. [§] 2511(a)(2), when the testimony at trial demonstrated that Father had made significant efforts to maintain (i) suitable housing, (ii) gainful employment and (iii) a positive and important relationship with the Children and that the causes of any incapacity on the part of Father had been, or were in the process of being, remedied?

3. Did the Honorable trial court commit error in terminating the parental rights of Father, pursuant to 23 Pa.C.S.A. [§] 2511(a)(8), when the testimony at trial demonstrated that Father had made significant efforts to maintain (i) suitable housing, (ii) gainful employment and (iii) a positive and important relationship with the Children, and established that the conditions which led to the removal of the Children had been largely and successfully addressed and that termination of parental rights would not serve the best interests of the Children?

4. Did the Honorable trial court commit error by involuntarily terminating Father's parental rights where the facts did not establish by clear and convincing evidence that such termination was in the best interests of the Children as contemplated by 23 Pa.C.S.A. [§] 2511(b)?

Father's Brief, at 2.[3]

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for

_____

[3] Father has waived any challenge to the change in the Children's permanency goal to adoption under 42 Pa.C.S.A. § 6351 by failing to raise the issue in his concise statement and statement of questions involved in his brief. *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in his brief on appeal).

- 4 -

termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As [our Supreme Court] discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead [appellate courts] must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" ***Id.*** (*quoting* ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Sections 2511(a)(2) and (b) provide, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

The Supreme Court set forth our inquiry under Section 2511(a)(2) as follows:

> As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .
>
> [Our Supreme] Court has addressed incapacity sufficient for termination under § 2511(a)(2):
>
>> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986) (*quoting In re: William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness

regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

The trial court provided the following analysis with regard to Section 2511(a)(2):

> THE COURT: The evidence that this [c]ourt received at that hearing showed that [Father] failed to follow through on the Family Service Plan directives for mental health evaluations, therefore, mental disability is not a factor or a credible factor in this case. I will, however, put the facts determined by this [c]ourt on the record at this time. I want to start off by noting the existence of the Family Service Plans. In fact, there were six Family Service Plans created in this case. That means there are or there were six attempts to try to make this process work. This [c]ourt received evidence that [Father] refused services from OCY, refused treatment, refused parenting classes, and this [c]ourt finds that that is extremely unfortunate because you can always learn something. No one in this room knows it all, and when afforded the opportunity to learn something, especially as it relates to your precious children, the expectation is there that that opportunity will be taken advantage of.
>
> Both of these boys at issue here have special challenges and both see a psychiatrist. Their behavior is serious; their behavior is extreme. The classes would have provided an opportunity to learn how to deal with that, to learn how to make them better people based on knowing what else is out there to help you.
>
> Overall[,] this [c]ourt noted through the testimony and through the evidence presented a lack of compliance and a lack of cooperation. In addressing the issue of neglect, that feature is illustrated by [Father]'s self-serving behavior. Upon learning that his [C]hildren were in foster care, [Father] waited two days later to contact the Office of Children & Youth because, as he testified, he had work to do, much like there was work to do this morning. [F]ather never asked the caseworker for her phone number so that he could call and contact the boys. In fact, [Father] never asked about the boys and how they were doing of the caseworker.

- 8 -

[Father] failed to respond to documentation or letters from the Office of Children & Youth. There is one huge glaring exception in that contact with OCY and that is that [Father] contacted OCY when he needed help related to the protection from abuse issue. His actions showed this [c]ourt that he was capable of contacting the Office of Children & Youth, however, he did so only when he wanted to, even though his cooperation was for his [C]hildren's best interest.

I was particularly struck by [Father]'s last words of his testimony. He said, "I'm not letting anyone take away my rights to my kids." That is a wonderful sentiment, however, although this hearing is about rights and the termination of [Father]'s rights, overall this [c]ourt would like to point out that the [C]hildren have rights. They have rights to good housing, food, supervision, and love. So in the end this entire process, this interaction with the Office of Children & Youth, it's not about [Father]. It is truly about the best interest of the [C]hildren.

I am going to now address the issue of parental drug use. This [c]ourt did receive evidence of [Father]'s admission regarding his use of alcohol and smoking marijuana. Although [Father] refused urine testing, his continued drug and alcohol use made it impossible for him to provide the parental care, control, housing, comfort, nutrition and support necessary for the [C]hildren's physical and mental well-being. I find that OCY has presented clear and convincing evidence that [Father]'s drug use creates a parental incapacity and has resulted in neglect of parental duties and an inability to provide a safe and secure home for the [C]hildren.

Moreover, this drug use is a condition that led to the removal of the [C]hildren from the home in the first place, and I find that OCY has demonstrated that this condition cannot and will not be remedied by [Father] within a reasonable period of time. Most notably, [Father] has testified under oath regarding his continued drug use. Given the length of time, I mean these [C]hildren have been in custody since June of 2015, this [c]ourt finds that these [C]hildren have been placed in foster care for a great length of time and I find that OCY has demonstrated that the conditions that led to the removal of the [C]hildren from the home cannot or will not be remedied within a reasonable period of time.

Next, I am unable to address the issue of the parent's incapacity to parent because [Father] failed to comply with OCY directives regarding evaluation and treatment related to any mental health issues. [4] Again, it all rolls back to the lack of cooperation and the failure to comply with the Family Service Plan directives.

* * *

With respect to each child, OCY has established continuing neglect by [Father] by clear and convincing evidence.

Trial Court Opinion, 3/17/17, at 9-13, 17.

With regard to Section 2511(a)(2), Father argues that the trial court erred when it concluded that his repeated and continued incapacity, abuse, neglect or refusal has caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being, and that he cannot or will not remedy the conditions and causes of the incapacity, abuse, neglect or refusal. Father asserts that the evidence admitted at the hearing concerning his prior conviction for simple assault and his two convictions for possession with intent to deliver was stale. He alleges that the two drug convictions occurred more than fifteen years prior to the filing of the termination petitions, and that the assault conviction occurred more than six years prior to the filing of the termination petitions. Father's Brief, at 15. Father also asserts that he did not serve any

---

[4] The trial court apparently intended to state that it lacked the results of a mental health evaluation to consider in determining Father's parenting capacity, as Father had failed to comply with OCY directives set forth in the Family Service Plans, and not that the court was unable to determine that Father had a parenting incapacity for purposes of Section 2511(a)(2).

incarceration for the convictions. *Id.* Father claims that alcohol abuse and other criminal behavior is part of his distant past, and that he is living a productive, law-abiding life, and is gainfully employed. *Id.* Father states that he has maintained stable housing and long-term employment, and has remained free from alcohol and hard drugs. *Id.* Father argues that he loves the Children and has engaged in positive visits with them. *Id.* Father states that his testimony with regard to his housing and employment confirms his determination to remedy any issues that resulted in OCY obtaining custody of the Children. *Id.*

The trial court, however, disagreed with Father's assertion that his drug-related convictions were stale, and that his current drug use did not affect his capacity to perform his parental duties. Although part of the trial court's discussion in considering Section 2511(a)(1), the trial court assessed the evidence concerning the effect of Father's current drug use on his present capacity to render proper parental care as follows:

> So the biggest thing here before this [c]ourt is what's a parental duty? What does that mean? Well, parental duties has been defined as follows and I am taking this from the case *In re B.,N.M.* cited at 856 A.2d 847 [(Pa. Super. 2004)]. That's a 2004 case. And the definition of parental duties is this. Simply there is no easy or simple definition of parental duties. Parental duties is best understood as it relates to the needs of the children. These children need love, protection, guidance, and support. These needs, they are both physical and emotional, they can't be met by a merely passive interest in how the child is developing. Thus the courts have held that parental obligation is a positive duty which requires affirmative performance. And in plain language all that means is you have got to do something. You have got to do something positive. You have got to go the

parenting classes. You have got to stop smoking weed. You have got to, you know, you have got to do something. You can't just lay back and do nothing.

Now, this affirmative duty or the act of doing something is even more than a financial obligation, which wasn't even addressed at the hearing here. It requires a continuing interest in the [C]hildren and a genuine effort to maintain some form of communication and association with these [C]hildren. These [C]hildren need more than a benefactor. Parental duty requires that a parent exert himself to take and to maintain a place of importance in their children's life.

* * *

In this case before me, this [c]ourt determines that OCY established by clear and convincing evidence that [Father] failed to perform any parental duties for a period of six months prior to the filing of this petition for termination of parental rights.

Trial Court Opinion, 3/17/17, at 13-17.

The trial court concluded that Father's current drug use impeded his ability to have a proper parental capacity to care for the Children, without consideration of his prior drug-related convictions and his conviction for simple assault. After a careful review of the record, we find that termination of Father's parental rights to the Children was warranted pursuant to Section 2511(a)(2). Father has demonstrated a repeated and continued incapacity, abuse, neglect or refusal to parent the Children that has caused them to be without essential parental care, control or subsistence necessary for their physical or mental well-being. Moreover, the evidence showed that Father will be unable to remedy those conditions. As there is competent evidence in the record that supports the trial court's findings and credibility

- 12 -

determinations, we find no abuse of the trial court's discretion in terminating Father's parental rights to the Children under Section 2511(a)(2). *In re Adoption of S.P.*, 47 A.3d at 826-827.

Next, this Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but it is on the child pursuant to Section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*). In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], [our Supreme] Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

With regard to Section 2511(b), the trial court stated the following:

In this case, the testimony clearly established that there is limited affection and [Father] cares for and minimally plays with the [C]hildren. [Father] has not maintained sufficient and consistent contact and there is no parental bond between the [C]hildren and [Father].

Since June the 2nd, 2015, [Father] was offered biweekly visits. He attended nine of thirty-one visits offered, four of them late. And more specifically between March 4th and August the 1st of 2016, [Father] only attended two visits. [Father]'s testimony or

his reason for the lack of visits is that he had to work. His testimony says he found it hard to visit because he works five days a week and he had to work.

During the visits this [c]ourt heard testimony, credible testimony, that [Father] failed to bring toys, snacks, birthday gifts. This [c]ourt heard testimony that there was very limited interaction with the kids. After an initial hello, there was no interaction unless the [C]hildren initiated it. During the visits there was a focus on the phone and there were no hugs or physical interaction. I guess most strikingly to me was [Father]'s failure to, in addition to failing to provide birthday gifts or a card for birthdays, which are important to most American children, [Father] was not aware of the [C]hildren's birthdays.

In this case[,] [Father] also seemed content to wave to his [C]hildren who he saw riding on a school bus as opposed to making it his purpose to visit them during the OCY offered visitation. [Father] also was unaware of the extent of the special needs that his [C]hildren possess. In this case[,] the [c]ourt finds that [Father] has not provided a home, has not met the [C]hildren's needs, and has not maintained a consistent and strong parent-child relationship. [Father]'s desire to do this at this time is insufficient to meet the [C]hildren's needs for consistent and reliable love, affection, and responsibility.

I conclude that the emotional needs and the welfare of both boys can best be met by termination of the parental rights of [Father], and that the [C]hildren will not suffer a detriment as a result of termination of the parental rights of [Father]. In this case[,] I find that the parental bond between [Father] and each child does not exist.

By contrast, I find that a bond has developed between the foster parent and the [C]hildren that has been described during testimony as loving, supportive and structured. These are from the testimony regarding the [C]hildren's attachments to their foster parent and expressing the level of comfort in the foster/pre[-]adoptive home. Now, these factors of loving support and structure are overwhelmingly important to these [C]hildren given the personal challenges that each child faces.

Therefore, I find from the evidence and testimony that termination of [Father]'s rights best serves the needs and welfare of each child and termination of parental rights of [Father] will not irreparably harm any of the [C]hildren.

On this day, based upon the facts presented and the law, I must enter a final decree terminating the parental rights of [Father] [D.E.] to [the Children].

* * *

This [c]ourt has found aggravating circumstances in this matter considering the fact that the [C]hildren have been in the custody of OCY since June the 2nd, 2015. That length of time that the [C]hildren have been in placement and the fact that there is an identified adoptive resource, this [c]ourt will grant the OCY request for a goal change to that of adoption.

Trial Court Opinion, 3/17/17, at 17-24.

Father argues that OCY failed to satisfy the statutory requirements for termination under Section 2511(b). Father testified that he loves the Children, that they "mean the world" to him, that he has bought them toys and bicycles, and that he wants "to be a part of their lives." Father's Brief, at 20 (*citing* N.T., 9/11/14, at 100-101, 105, 170-171). Father also asserts that the evidence demonstrated that there is a bond between him and the Children. Father's Brief, at 20-21. Father complains that the trial court made its decision in the absence of any expert testimony regarding bonding, and relied unduly on OCY caseworkers. *Id.* at 21. Father urges that, given his impressive personal improvement, OCY failed to establish that severing the bonds between him and the Children was in the best interest of the Children. *Id.* at 21. Father contends that the termination of his parental

rights will deny the Children the opportunity to pursue a relationship with a father who dearly loves them, has made great strides to be a productive citizen, and badly wants to be a positive part of their lives. *Id.*

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, [S]ection 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis. We have previously determined that:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . [his] child is converted, upon the failure to fulfill . . . [his] parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Further, this Court has held that a parent's love of his child, alone, does not preclude a termination. *See In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007) (stating that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (*citing* **In re Z.S.W.**, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.").

After a careful review of the record, we find that termination of Father's parental rights to the Children was warranted pursuant to Section 2511(b), as the evidence showed that the Children's developmental, physical

and emotional needs and welfare will best be met by the termination of Father's parental rights. Further, the evidence showed that there is no bond between Father and the Children that is worth preserving. As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we find no abuse of the trial court's discretion in terminating Father's parental rights to the Children under Section 2511(b). *In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

We, therefore, affirm the trial court's decrees terminating Father's parental rights to the Children, and the orders changing the Children's permanency goal to adoption.

Decrees and orders affirmed.
*Judgment Entered.*

Joseph D. Seletyn, Esq.
*Prothonotary*

Date: <u>10/2/2017</u>